## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Hunterstown Ruritan Club,       :
                                      : No. 1204 C.D. 2015
                    Appellant     : Submitted: February 19, 2016
                                        :
               v.                     :
                                        :
Straban Township                  :
Zoning Hearing Board        :


BEFORE:   HONORABLE ROBERT SIMPSON, Judge
               HONORABLE MICHAEL H. WOJCIK, Judge
               HONORABLE DAN PELLEGRINI, Senior Judge


OPINION BY JUDGE WOJCIK             FILED: July 14, 2016


Hunterstown Ruritan Club (Club) appeals from the June 12, 2015 order of the Court of Common Pleas of Adams County (trial court) denying the Club's appeal from a decision of the Zoning Hearing Board of Straban Township (Board), which denied the Club's application to expand a prior nonconforming use on property it owns in Straban Township, Adams County.[1] For the reasons that follow, we reverse and remand.

The Club is a local unit of the larger Ruritan community service organization. In 1955, the Club purchased a 14-acre property along Red Bridge Road for the purpose of providing the community with recreational opportunities,

---

[1] By order dated January 16, 2016, the Board was precluded from filing a brief in this matter after failing to comply with this Court's December 14, 2015 order directing it to do so within 14 days.

such as baseball fields, picnic areas, swing sets, and other activities typically found in community recreation parks. (Board's Findings of Fact Nos. 1-4.)

A portion of the property was informally used for go-cart racing beginning in the early 1960s. The Club eventually entered into a relationship with the Hunterstown Kart Club (HKC), some of whose members belonged to both organizations. Subsequently, the two groups formalized their relationship, and in 1982, they entered into the first written lease governing HKC's use of the property for go-cart racing. (Board's Findings of Fact Nos. 5-6.)

The property was not zoned until 1992, when the township adopted its first zoning ordinance (Ordinance). The Club's property is zoned MU-2, and go-cart racing is not a permitted use in that district. However, the parties stipulated that go-cart racing was a legal pre-existing nonconforming use when the Ordinance was adopted.[2] In 1992, go-cart racing primarily took place on Saturdays, but races also were held on occasional Sundays as early as 1972. (Board's Findings of Fact Nos. 7-8.)

In 2002, the intensity of the use of the property for go-cart racing began to increase incrementally, and over time both the use of the land and the hours of operation expanded. In October 2011, the township's zoning officer issued a written notice of zoning violation to the Club. In accordance with

---

[2] Ordinance section 140-26A (nonconforming uses) states:

> A. Continuation. Any nonconforming use existing on the effective date of this chapter or created by an amendment to this chapter may be continued, although such use does not conform to the provisions of this chapter. Change in ownership or possession of the use or property shall not prevent the continuance of the nonconforming use.

Ordinance section 140-27,[3] the Club applied for a certificate of nonconformance, requesting recognition of the use of the property for go-cart racing on Saturdays and Sundays.[4]  On February 17, 2012, the zoning officer issued a Certificate of Non-Conformance that identified the pre-existing nonconforming conditions as follows: "The non-conforming use consists of Go Kart Racing events located on the existing track at the above site on Saturdays only with all racing ending at or before 11 pm.  Any expansion of this non-conformity must be approved by the

[3] In relevant part, section 140-27 states:

> A. An application for a certificate of nonconformance may be made to the Township by the owner of any nonconformity, with the assistance of the Zoning Officer, as of the effective date of this chapter . . . .
>
> B. For previously unregistered nonconformities, the Zoning Officer shall provide the property owner with an application for a certificate of nonconformance at the time such nonconformity is discovered.
>
> C. The certificate of nonconformance shall set forth in detail all of the nonconforming conditions of said property as of the effective date of this chapter . . . .
>
> *   *   *
>
> F. The Zoning Officer shall investigate the content of any application for registration of nonconformity.  If the Zoning Officer is able to verify the existence of the nonconformity at the time that the land, use, and/or structure became a nonconformity, he shall issue a certificate of nonconformity.  Otherwise, the Zoning Officer shall deny the application and advise the applicant of that decision, and of the applicant's right to appeal that decision to the Zoning Hearing Board.

[4] The record does not reflect any further information concerning the violation notice.

municipality prior to its establishment." (Applicant's Ex. 3.) The certificate further stated:

> Issuance of this certificate is based upon evidence submitted by the applicant and with the mutual understanding that this certificate does not exempt the above-described property from the applicable provisions of the Zoning Code pertaining to non-conforming uses. This certificate also does not relieve the Owner or Lessee from the responsibility to collect and submit any required Amusement Tax or from compliance with any other Municipal regulation or ordinance.

(*Id.*) Neither the certificate nor the February 17, 2012 letter to the Club from the zoning officer, (Township Ex. 1), advised the Club that it had a right to appeal.

Thereafter, the Club filed an "Application to the [Board] for a Zoning Hearing" on March 5, 2012, accompanied by a copy of the certificate of nonconformance. (Board Ex. 1.) In completing the first page of the three-page form, the Club described the proposed use of the property as "expansion of activity to allow current use after 11:00 p.m. on Saturday and on Sunday." On the next page, the Club checked the box for requesting a nonconforming use change, adding that it sought expansion of a prior-existing nonconforming use to allow for racing on Saturday after 11:00 p.m. and on Sunday. At the April 18, 2012 hearing, the Club amended the application to remove the request to allow racing after 11:00 p.m. on Saturday. Counsel for the Club also stated that the application was filed as a request for expansion under section 140-26B of the Ordinance.[5]

---

[5] Section 140-26B states as follows:

> Extension. Extension of the nonconforming use shall be approved by the Zoning Hearing Board as a special exception, subject to the following standards and the provisions of §140-61E of this chapter.

**(Footnote continued on next page…)**

4

Larry Blount, the Club's president, testified that the Club was chartered in 1955 under the Ruritan National Organization of Dublin, Virginia. In 1957, the Club purchased the property at issue at a tax sale for the purpose of a community park. Blount has lived in the area since 2001. He became involved with the Club in 2002 and stated that it was primarily used for go-cart racing since that time. (R.R. at 18a-21a, 28a.)

Blount stated that he completed the request form for the certificate of nonconforming use in December 2011 seeking approval to continue racing on Saturdays and Sundays. Blount said that the zoning officer asked for more information and that the Club has been looking through their extensive records for relevant documents. He identified a treasurer's report from 1972 and testified that

---

**(continued…)**

(1) Extensions shall be limited to the lot containing the use at the time the use became nonconforming.

(2) The extension of the nonconforming use shall not replace a conforming use.

(3) The extension shall conform to the requirements of the underlying district and applicable supplementary regulations, including, but not limited to, lot, building, setback, coverage, buffering, height, parking and sign requirements.

(4) The volume and area devoted to the extension shall meet the requirements set forth below:
(a) [Related to the extension of nonconforming uses within or to existing structures].
(b) Land operations which are nonconforming uses (e.g., mineral recovery operations, agriculture activities, junkyards, and landfills) may be extended greater than 20% upon the approval of the Zoning Hearing Board.

it reflected at least two Sunday races during June and July of that year. (R.R. at 28a-29a.)

Blount testified that the Club disagreed with the terms of the certificate of nonconformity that excludes Sunday racing and asked its attorney "to file to expand the prior existing nonconforming use certificate." (R.R. at 29a.) He added that the Club reviewed the criteria of Ordinance sections 140-26B and 140-61E and that the Club satisfied those specific requirements. Blount noted that the property is now used exclusively for go-cart racing. He added that the Club contributes several thousand dollars to the community every year in various ways, including scholarships. (R.R. at 30a-37a.)

Blount testified that the Club applied for recognition of racing on both Saturdays and Sundays as a pre-existing nonconforming use when it filed the request for the certificate of nonconformance. Blount further stated that the Club submitted evidence to establish the existence of Saturday and Sunday racing and never received an explanation as to why the certificate did not include authorization for racing on Sundays. (R.R. at 54a.)

Keith L. Blumenstein, Sr., president of the HKC, testified that he had been racing at the property since 1989. He estimated that he raced ten to twelve times at the property that year. He stated that approximately 28 races took place in 2011, with eight of those races scheduled on Sundays. Blumenstein testified that although Saturday racing was more popular in the 1990s, Sunday is now the more popular day, and he believed that the ability to hold races on Sundays was essential to the continued existence of the HKC.

Blumenstein testified that alcohol was not allowed on the property. He stated that trash is picked up the day after racing and a waste company picks up

6

the dumpster on Wednesdays. "Porta-potties" are leased. Parking of cars, trucks, and trailers is overseen and patrons are directed to parking places; when occasionally people park on the street, they are asked to move their cars.

Blumenstein estimated that 250 people raced on the Sunday prior to the hearing. He said that traffic is manageable because races are scheduled by division for racers ages five to sixty and people come and go at different times. He stated that a new public address system had been installed; the speakers all face the track and there are no speakers on the side of the property near houses. Blumenstein testified that the prizes for some races are t-shirts or trophies, and some are cash purses of up to $10,050.

Finally, addressing pedestrian access, Blumenstein testified that there are no sidewalks anywhere in the Hunterstown area. He also noted that go-carts are not street legal and must be trailered to the property. (R.R. at 55a-66a, 68a, 75a-76a, 83a-84a.)

Robert Clem Malot, the township's zoning officer, testified that the Club did not provide any documentation to demonstrate that racing took place prior to 1992. He believed that a cover letter he sent with the certificate sufficiently explained the reasons for his determination. (R.R. at 86a-89a.)

Frank Thomas testified that he has lived directly across the street from the property since at least 1992. He stated that no Sunday racing had taken place at the property until about 2007. Thomas said that when the Club was first considering the track, it stressed that racing would only occur on Saturdays and end by 11:00 p.m. to appease his father and get community support for the track. Thomas complained that the go-carts are very loud and that cars park all along the road. He testified that he cannot enjoy his outdoor property during racing because

7

of the noise; he said he understood that the track has existed for 47 years and he tolerates racing on Saturdays, but he would like to be outside on Sundays. (R.R. at 91a-98a.)

George Brown, owner of property adjacent to the track, testified that when he purchased his house in 1976, racing took place only on Saturdays, and Sunday racing did not begin until after 2000. Like Thomas, Brown said that due to the noise, he cannot enjoy a picnic or even hold a conversation outside when racing is taking place. He also said that there were more go-carts and much greater noise on Sundays than Saturdays. (R.R. at 102a-06a.)

In addition to the findings summarized above, the Board found that the Club had not demonstrated that the proposed expansion of the nonconforming use satisfied the requirements of the underlying zoning district and applicable supplementary regulations. Specifically, the Board determined that the proposed use does not meet applicable buffering or parking requirements. The Board also found that the proposed use does not satisfy the special exception standards at section 140-61E of the Ordinance. In that regard, the Board found that the proposed expansion will significantly devalue neighboring properties. (Board's Finding of Fact No. 17(b).) The Board also found that: the Club failed to demonstrate that the use is consistent with the logical extension of public services, such as water or sewer; the Club did not establish planning with respect to environmental issues, where the proposed use increases noise, traffic, parking needs, pedestrian use of the land, and removal of vegetation; the Club did not demonstrate safe and adequate access to streets for vehicles or for pedestrian access to the property; the Club has not provided fencing or screening, which is a factor in the devaluation of adjoining properties; the proposed use does not satisfy

8

the parking requirements of the Ordinance: the number of spaces were not established, and the spaces are not marked to identify parking for standard vehicles and handicapped parking; and the Club did not establish either the adequacy of illumination of the property or its effects on adjacent properties. (Board's Findings of Fact Nos. 17-(a)-(g).)

The Board explained that, in rendering its decision, it recognized that the Club has a pre-existing nonconforming use. The Board next noted that the Club did not appeal from the use certificate issued by the zoning officer. However, the Board stated that this fact "does not control the decision in this case since the nonconforming use certificate as well as the testimony at hearing establishes that the use existed on the date [the Ordinance was adopted]," and the Board acknowledged that "[t]he contents of the certificate do not freeze the use as it existed at the time of Ordinance adoption." (Board decision, discussion.) The Board observed that the application submitted by the Club requested an expansion of a nonconforming use under the provisions of Ordinance section 140-26, under which an applicant must satisfy the requirements for a special exception. Based on the findings summarized above, the Board concluded that the Club failed to satisfy the special exception standards of the Ordinance and denied the Club's application for an expansion of its nonconforming use.

The Club appealed to the trial court, arguing that it was not proposing a change in use or to physically expand the area used for racing but only to conduct the same racing that had occurred for years. The township countered that the issue before the Board was not whether there was a prior nonconforming use for Sunday racing but whether the Club was able to meet Ordinance requirements to expand racing to include Sundays. The trial court reasoned that the Club's failure to

9

appeal from the certificate of nonconformance as well as its application for a nonconforming use change indicated that the Club was not challenging the limitation of its nonconforming use to Saturdays only, but was seeking to expand the use to include Sundays. The trial court further concluded that the Board did not deny the Club its right to the natural expansion of its nonconforming use but, instead, "accepted the Certificate of Nonconformance as establishing the prior use (racing on Saturdays only) and then denied the request to extend racing to Sundays" based on a failure to satisfy Ordinance standards. (Trial court op. at 5.) Accordingly, the trial court denied the Club's appeal.

On appeal to this Court,[6] the Club first argues that it never abandoned the nonconforming use of go-cart racing on Sunday. The Club maintains that the Board's Finding of Fact No. 8 confirms that fact and supports the Club's position that the lawful nonconforming use includes racing on both Saturday and Sunday.[7] We agree.

---

[6] Where, as here, the parties present no additional evidence to the trial court, our scope of review is limited to determining whether the zoning hearing board committed an error of law or abused its discretion. *Good v. Zoning Hearing Board of Heidelberg Township*, 967 A.2d 421, 423 n.5 (Pa. Cmwlth. 2009).

[7] The Club also argues that the Board erred in requiring it to satisfy the standards of section 140-26B3, which are applicable to nonconforming use expansions that involve a change in physical characteristics or footprint. The Club contends that such requirements are not applicable to an established use that is conducted within an established footprint, when the only issue for consideration is the operation of the same use on a different day. Specifically, the Club asserts that the Board erred in applying section 140-26B3, requiring the Club to satisfy the Ordinance provisions governing lot, building, setback, coverage, buffering, height, parking and sign requirements, where the proposed expansion is merely temporal. The Club emphasizes that Sunday racing does not involve an enlargement of the track or facilities, such as parking, concessions, or toilets, but utilizes existing parking and facilities on the same property with the existing buffers, etc., that accommodate the preexisting nonconforming use.

**(Footnote continued on next page…)**

10

A lawful nonconforming use is a use that predates the enactment of a prohibitory zoning restriction, *DoMiJo, LLC v. McClain*, 41 A.3d 967, 972 (Pa. Cmwlth. 2012), and the right to continue a legal nonconforming use is entitled to the constitutional protection of due process. *Smalley v. Zoning Hearing Board of Middletown Township,* 834 A.2d 535, 539 (Pa. 2003). In *Pennsylvania Northwest Distributors, Inc. v. Zoning Hearing Board of Moon Township*, 584 A.2d 1372, 1375 (Pa. 1991), the court explained that the fundamental basis for the protection of uses and structures that were lawful when instituted is the "inherent and indefeasible" right of this Commonwealth's citizens to possess and protect property guaranteed by Pa. Const. art. I, §1. Thus, "[a] lawful nonconforming use establishes in the property owner a vested property right which cannot be abrogated or destroyed, unless it is a nuisance, it is abandoned, or it is extinguished by eminent domain." 584 A.2d at 1375. In this case, the Board specifically found that Sunday racing took place prior to the enactment of the Ordinance, and nothing in the record suggests that such use was abandoned.

In *DoMiJo,* we contrasted a property owner's constitutionally protected property right to continue a legal nonconforming use, which is an interest

---

**(continued…)**

As to the special exception standards set forth in Ordinance section 140-61E, the Club further asserts that, since no public water or sewer services are available in the area of the property, a rural and substantially undeveloped area of the Township, the Board abused its discretion by finding that the Club failed to offer evidence of a logical extension of public utilities. The Club also argues that the Board erred in finding that off-street parking and lack of pedestrian access present safety hazards and that lack of fencing or screening are factors that devalue adjoin properties. According to the Club, the testimony of objectors was entirely speculative and insufficient to establish harm to the public health, safety and welfare.

that runs with the land, with a certificate of nonconforming use, which is personal to the property owner. *Id.* at 972.

> A certificate proves the existence of a nonconforming use. The mere absence of a certificate [of nonconforming use] does not deprive the landowner of his right to continue a lawful nonconforming use. Rather, in an administrative proceeding such as this, absence of a certificate generally deprives a landowner of the most efficient method of proving the existence of the use, and shifts to the landowner the burdens of proof and persuasion. In short, a certificate represents a procedural advantage, not an independent property right. Conversely, the lack of a certificate results in a procedural disadvantage and not in the loss of a property right.
>
> Here, the [Board] determined [that the applicant] was not entitled to continue the nonconforming use because it failed to timely re-register the use after purchasing the subject property. The [Board] erred in reaching this legal conclusion. *Because the right to continue a nonconforming use arises from constitutional protections and not from regulatory provisions, the right cannot be lost in this way.*

*Id.* at 973 (emphasis added). Similarly, the Board erred in this case by concluding that the Club was not entitled to continue its nonconforming use because the use was not reflected in the certificate of nonconformance.

Additionally, under the doctrine of natural expansion, "the right to expand [a nonconforming use] as required to maintain economic viability or to take advantage of increases in trade, is also constitutionally protected." *Nettleton v. Zoning Hearing Board of Pittsburgh*, 828 A.2d 1033, 1037 n.3 (Pa. 2003). Consequently, "a nonconforming use cannot be limited by a zoning ordinance to the precise magnitude thereof which existed at the date of the ordinance . . . ."

12

*Humphreys v. Stuart Realty,* 73 A.2d 407, 409 (Pa. 1950). *See, e.g.*, *Limley v. Zoning Hearing Board of Port Vue Borough*, 625 A.2d 54 (Pa. 1993) (use of property as a public restaurant and bar was a permissible expansion of a prior nonconforming use as a private club); *Pappas v. Zoning Board of Adjustment of City of Philadelphia*, 589 A.2d 675 (Pa. 1991) (full-service pizza restaurant was a permissible expansion of a takeout sandwich shop); *Chartiers Township v. William H. Martin, Inc.,* 542 A.2d 985 (Pa. 1988) (upholding the protected right of operators of a nonconforming landfill to increase the daily intake of solid waste); *Silver v. Zoning Board of Adjustment,* 255 A.2d 506 (Pa. 1969) (invalidating as unconstitutional a zoning provision that prohibited any increase in the number of dwelling units in an apartment building that was lawfully nonconforming as to use); *Itama Development Associates, LP v. Zoning Hearing Board of Rostraver*, 132 A.3d 1040 (Pa. Cmwlth. 2016) (increase in the intensity of a prior use such as variations in the types of vehicles and hours of operation did not justify a finding of a new or different use); *Foreman v. Union Township Zoning Hearing Board*, 787 A.2d 1099 (Pa. Cmwlth. 2001) (mere increase in the frequency of adult entertainment does not render the current use of the property a new or different use); *Clanton v. London Grove Township Zoning Hearing Board*, 743 A.2d 995 (Pa. Cmwlth. 1999) (processing topsoil by drying and bagging it prior to transport was a continuation of the nonconforming use of trucking loose topsoil away for bulk sale).[8]

---

[8] These protections are applicable only to nonconforming *uses*. In contrast, nonconforming structures have no protected right to expand in violation of the applicable regulations. *Nettleton,* 828 A.2d at 1037 n.3 (citing *Miller & Son Paving, Inc. v. Wrightstown Township,* 451 A.2d 1002, 1007 (Pa. 1982), and *Fagan v. Philadelphia Zoning Board of Adjustment,* 132 A.2d 279, 281 (Pa. 1957)).

While the right to continue a legal nonconforming use is entitled to constitutional protection, the right to natural expansion is not unlimited, and municipalities may impose reasonable restrictions on expansions of nonconforming uses. *Smalley*, 834 A.2d at 544; *Silver v. Zoning Board of Adjustment*, 255 A.2d 506, 507 (Pa. 1969) (expansion may not be detrimental to public health, welfare, and safety). Thus, "conditions on the land associated with the protected use" may be subject to reasonable regulation. *Baer v. Zoning Hearing Board of Quincy Township*, 782 A.2d 597, 601 (Pa. Cmwlth. 2001); *Cornell Uniforms, Inc. v. Abington Township*, 301 A.2d 113 (Pa. Cmwlth. 1973) (zoning board has continuing authority to place reasonable restrictions on a nonconforming use).

However, such regulation cannot be accomplished by way of a certificate of nonconformance, which, as the Board correctly noted, can neither expand nor limit a lawful nonconforming use. Indeed, it is now well settled that the grant or denial of a nonconforming use certificate has no bearing on an individual's property rights. *Slusser v. Black Creek Township Zoning Hearing Board*, 124 A.3d 771 (Pa. Cmwlth. 2015).[9] The issuance of a nonconforming use certificate does not grant a landowner any additional property rights, *id.,* and the

---

[9] In *Slusser*, objectors appealed the issuance of a nonconforming use certificate to a nearby landowner. The trial court affirmed the dismissal of the appeal as untimely, and this Court affirmed on different grounds. Specifically, we concluded that an application for a nonconforming use certificate is not an "application for development" under section 914.1 of the Municipalities Planning Code (MPC), Act of July 31, 1968, P.L. 805, added by the Act of December 21, 1988, P.L. 1329, 53 P.S. §10914.1 ("No person shall be allowed to file any proceeding with the board later than 30 days after an application for development, preliminary or final, has been approved . . . ."). We held that the issue of whether the appeal was timely was irrelevant and that, because the approval of the nonconforming use certificate did not grant the landowner any additional property rights, or authorize new development or construction, the zoning officer's issuance of the certificate was not appealable under section 914.1 of the MPC.

14

absence of a certificate does not deprive landowner of his right to continue a lawful nonconforming use. *TKO Realty, LLC v. Zoning Hearing Board of Scranton,* 78 A.3d 732 (Pa. Cmwlth. 2013). The purpose of a nonconforming use certificate is simply to document the existence of the nonconforming use. *Slusser*, 124 A.3d at 774. Consequently, the failure to appeal from the terms of a certificate of nonconformance results only in a procedural disadvantage and not in a restriction or limitation of constitutionally protected property right. *DoMiJo.*

Here, while the Board purportedly recognized the legal insignificance of the certificate, it nevertheless failed to recognize that the Club's preexisting lawful use of the property for Sunday racing was entitled to constitutional protection. After receiving a document that, on its face, deprived the Club of its lawful nonconforming use of the property on Sundays, the Club was forced to request a hearing, during which it presented evidence to establish that Sunday racing preceded the adoption of the Ordinance, *see* Board's Finding of Fact No. 8, that such use expanded over time, and that Sunday racing is essential to the continued viability of the Club. *See*, *e.g.,* R.R. at 62a-65a. In addition to arguing that the increase in Sunday races over time was a natural expansion of a lawful nonconforming use, the Club acknowledged the concerns expressed by its neighbors and represented that it would comply with all aspects of the Ordinance. (R.R. at 124a-25a.) Given this record, the Board erred in determining that the Club is not permitted to hold *any* races on Sunday, and the trial court erred in affirming the Board's decision.[10]

---

[10] We do not address whether the Club's present use of the property for Sunday racing falls within the natural expansion doctrine because the Board made no findings in this regard. Although the Club presented evidence concerning the existence and expansion of the Club's **(Footnote continued on next page…)**

Accordingly, we reverse the trial court's order and remand this matter to the trial court for further proceedings, which may include remand to the Board.

_____
MICHAEL H. WOJCIK, Judge

---

**(continued…)**

nonconforming use of the property for Sunday races, the Board did not find, even in the alternative, that the use exceeded the bounds permitted under the natural expansion doctrine.

16

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Hunterstown Ruritan Club,          :
                                   :  No. 1204 C.D. 2015
                    Appellant      :
                                   :
              v.                   :
                                   :
Straban Township                   :
Zoning Hearing Board               :


O R D E R


AND NOW, this 14th day of July, 2016, the order of the Court of Common Pleas of Adams County, dated June 12, 2015, is reversed, and the matter is remanded to the trial court for further proceedings consistent with the forgoing opinion.


Jurisdiction relinquished.

_____
MICHAEL H. WOJCIK, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Hunterstown Ruritan Club,                    :
                    Appellant                :
                                             :
          v.                                 : No. 1204 C.D. 2015
                                             : Submitted:  February 19, 2016
Straban Township Zoning Hearing              :
Board                                        :


BEFORE:    HONORABLE ROBERT SIMPSON, Judge
           HONORABLE MICHAEL H. WOJCIK, Judge
           HONORABLE DAN PELLEGRINI, Senior Judge


DISSENTING OPINION BY
SENIOR JUDGE PELLEGRINI              FILED: July 14, 2016


          It is generally accepted that when an administrative determination is
made, with reasons given, an appeal can be taken to an administrative agency with
subsequent appeals allowed to trial courts and appellate courts.  That determination,
unless reversed on appeal, is final and cannot be collaterally attacked.  Properly
relying on *DoMiJo, LLC v. McClain*, 41 A.3d 967 (Pa. Cmwlth. 2012), the majority
holds that an administrative determination embodied in a certificate of
nonconformance[1] is not final, is not binding on the person who receives it, and

---

[1] Section 107 of the Municipalities Planning Code (MPC), Act of July 31, 1968, P.L. 805, *as amended*, 53 P.S. §10107, defines a "Nonconforming use" as "a use, whether of land or of structure, which does not comply with the applicable use provisions in a zoning ordinance or amendment heretofore or hereafter enacted, where such use was lawfully in existence prior to the enactment of such ordinance or amendment, or prior to the application of such ordinance or amendment to its location by reason of annexation."

**(Footnote continued on next page…)**

because it is personal to the property owner that receives it, does not run with the land. Because I would overrule *DoMiJo* and hold that a certificate of nonconformance issued pursuant to the Municipalities Planning Code (MPC)[2] is final as to the zoning nonconformity of the property, I respectfully dissent.

*DoMiJo* is based on three points, which are:

- A certificate of nonconformance does not fix the nonconforming use of the property but is only a procedural advantage or disadvantage in court cases and does not deprive an owner of the right to other "lawful" nonconforming uses not applied for and not listed.

- A certificate of nonconformance does not run with the property but is personal to the person who applied for it.

- That because the right to continue a nonconforming use arises from constitutional protections and not from regulatory provisions, the nonconforming right cannot be

---

**(continued…)**

The continuance of nonconforming uses under zoning ordinances is countenanced because it avoids the imposition of a hardship upon the property owner and because the refusal of the continuance of a nonconforming use would be of doubtful constitutionality. Even though zoning ordinances permit the continuance of nonconforming uses, it is the policy of the law to closely restrict such nonconforming uses and to strictly construe provisions in zoning ordinances which provide for the continuance of nonconforming uses. Nonconforming uses, inconsistent with a basic purpose of zoning, represent conditions which should be reduced to conformity as speedily as is compatible with the law and the Constitution.

*Hanna v. Board of Adjustment of Borough of Forest Hills*, 183 A.2d 539, 543 (Pa. 1962).

[2] Act of July 31, 1968, P.L. 805, *as amended*, 53 P.S. §§10101-11202.

DRP - 2

lost by some regulatory provision such as a certificate of nonconformance.

*DoMiJo*, 41 A.3d at 972-73.

Let us compare to see if these points are valid when compared with the statutory scheme that the General Assembly authorized the municipality to issue and a property owner to challenge a certificate of nonconformance.

**A.**

Section 613 of the MPC, 53 P.S. §10613, authorizes the municipality to establish a system to identify the nonconforming uses, i.e., a "census" of those uses and then provide for the registration of those uses so that all can know with certainty what the property can be used for. It provides:

> Zoning ordinances may contain provisions requiring the zoning officer to identify and register nonconforming uses, structures and lots, together with the reasons why the zoning officer identified them as nonconformities.

As can be seen, this provision authorizes a systematic way for a municipality to identify all the nonconforming uses, structures and lots that exist, not just some of those uses that exist on the property. It provides for the identification of those uses to enable a municipality to administer and enforce the zoning ordinance regarding such uses as well as to better aid in planning, i.e., rezoning. A "fixed and final" certificate of nonconformity also enables future owners of the property as well as adjoining property owners to know what the nonconformity is and how the

property can be occupied to the same extent that they would know how the property could be occupied if it was in conformity with the zoning ordinance.

Moreover, nothing in Section 613 of the MPC even suggests that a determination leading to a certificate of nonconformance is not an adjudication but some procedural device to be used in some speculative court action. Nor does it create a system where a certificate of nonconformance is personal to each person who receives a certificate. Zoning is property based, not people based; it is irrelevant who owns the property, so when the zoning officer identifies the nonconformity, just like a variance, the certificate [and variance] runs with the property and not with the individual.

**B.**

The central flaw in *DoMiJo* is that a certificate of nonconformance is a regulatory device to take away a property owner's nonconforming rights when it does no such thing. All that it does is allow the municipality to initially identify whether the nonconformity of the property is constitutionally allowed to continue. If a property owner disagrees with that determination, under Section 909.1(a)(3) of the MPC, added by Section 87 of the Act of December 21, 1988, P.L. 1329, 53 P.S. §10909.1(a)(3), that determination can be appealed to the zoning hearing board. That section provides:

> (a) The zoning hearing board shall have exclusive jurisdiction to hear and render final adjudications in the following matters:
>
> (3) Appeals from the determination of the zoning officer, including, but not limited to, the granting or denial

DRP - 4

of any permit, or failure to act on the application therefore, the issuance of any cease and desist order or the registration or refusal to register any nonconforming use, structure or lot.

Through this process set forth in the MPC, the property owner's constitutional right to use the property for the nonconforming use is not taken away; instead, a certificate of nonconformance is used to determine what the property owner's constitutionally protected nonconforming use is, with all the due process that the property owner is entitled to.

Accordingly for the foregoing reason, I respectfully dissent.

_____
DAN PELLEGRINI, Senior Judge